AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
7/20/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DTA___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
07/20/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___mba___ DEPUTY

United States of America

v.

Kimberly Elgin,

Defendant(s)

Case No. 8:21-MJ-498-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 14, 2021 in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Distribution of fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Ronald J. Saar, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: July 20, 2021

Judge's signature

City and state: Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: Benjamin R. Barron (x. 3536)

## I. AFFIDAVIT

I, Ronald J. Saar, being duly sworn, declare and state as follows:

## II. INTRODUCTION

1. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), an agency of the U.S. Department of Justice. I have been so employed since December 2020. I am currently assigned to Los Angeles Field Division ("LAFD") Orange County District Office ("OCDO"). At the OCDO, I am assigned to Enforcement Group-III ("ENF-III"), Los Angeles Field Division. ENF-III specializes in Counter-Narcotic Cyber and Dark-Web investigations.

2. I have received specialized training concerning violations of the Controlled Substances Act contained within Title 21 of the United States Code, while in the DEA Academy located in Quantico, Virginia. I have also participated in several narcotics investigations as a Special Agent. I have debriefed defendants and witnesses who had personal knowledge of major narcotics trafficking organizations. Additionally, I have participated in many aspects of narcotics investigations including conducting physical surveillance, executing search warrants, and conducting arrests. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking. In addition, I have received training in, and am familiar with, methods employed by narcotics organizations to

thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephones, counter surveillance, false or fictitious identities, and encoded communications.

3. Prior to my employment as a Special Agent with the DEA, I was a Police Officer with the New York City Police Department for six and a half years. In that role, I participated in the arrest and apprehension of numerous violent offenders as well as assisted in the swearing and execution of Search Warrants in and around New York City.

### III. **PURPOSE OF AFFIDAVIT**

4. This affidavit is made in support of a criminal complaint against and arrest warrant for Kimberly Noelle Elgin ("ELGIN") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Possession with Intent to Distribute Fentanyl), on or about April 14, 2021.

5. This affidavit is also made in support of search warrants for 5225 Via Murcia, Yorba Linda, CA, 92886 ("SUBJECT PREMISES") described in Attachment A-1, and a 2020 Toyota Corolla with California license plate number 8LLT481 ("SUBJECT VEHICLE") described in Attachment A-2. The items to be seized are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi), (b)(1)(C): distribution and possession with intent to distribute fentanyl, oxycodone, and other controlled substances, including distribution resulting in death (the "Subject Offenses"), as described in Attachment B. Attachments A-1, A-2, and B are incorporated here by reference.

2

6.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of reports by the Long Beach Police Department and DEA relating to the investigation of another target (Jackie Ferrari), and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## IV. STATEMENT OF PROBABLE CAUSE

### A.   Summary

7.      On April 24, 2020, April 15, 2021, and June 14, 2021, ELGIN sold pills and/or powder containing fentanyl, a Schedule II narcotic drug controlled substance, to a Confidential Sources ("CS") working with the Department of Homeland Security, Homeland Security Investigation ("HSI") and the Drug Enforcement Administration ("DEA") respectively.[1]  ELGIN sold approximately

---

[1] The CS is former narcotics distributor who sold narcotics via the United States Postal Service (USPS) until his/her arrest in a joint case by DEA, HSI, USPS, and Irvine Police Department. The CS has a previous criminal history that includes possession with intent to distribute, possession of controlled substance, and possession of drug paraphernalia.  The CS is working for the government in the hope of prosecution or sentencing benefits, though no promises have been made by law enforcement. Investigators consider the CS's information to be reliable. The CS has a history of reported drug use during his/her cooperation; however, he/she has been warned to not use narcotics.

26.5 gross grams containing fentanyl to a CS on April 24, 2020. On April 15, 2021 ELGIN sold approximately 97.1 gross grams of powder containing fentanyl to a CS.  On June 14, 2021, approximately two ounces of powder containing fentanyl to a CS. Additionally, on June 14, 2021, ELGIN also gave the CS approximately one gram of methamphetamine.

    8.   The April 2021 and June 2021 transactions took place at the SUBJECT PREMISES, *i.e.*, ELGIN's residence.  Law Enforcement and state records checks indicate ELGIN has been living in the SUBJECT PREMISES since approximately September 2020.  Surveillance and well as CS statements indicate the home belongs to ELGIN's parents, who also reside there.

    9.   I and other agents are also investigating ELGIN for distributing fentanyl to victim C.L. resulting in her overdose death in August 2018.  As set forth below, I believe that C.L. purchased opioids from ELGIN around three before her death. During a related investigation into another drug trafficker associated with ELGIN, Jackie Ferrari, investigators seized text messages in which ELGIN admitted that she sold opioids to C.L. before her death.

    **B.**   **Controlled Purchases from ELGIN in 2020 and 2021**

    10.   Beginning on or around July 2019, the CS provided information to investigators regarding ELGIN's involvement in drug sales.  The CS stated that he/she had multiple sources of supply for fentanyl, methamphetamine, and other illegal drugs in and around Los Angeles County, Riverside County, and Orange County areas.  The CS stated that he/she had information about

ELGIN, including that ELGIN was trying to put him/her in contact with another distributor in the Orange County area, and that ELGIN also was personally distributing controlled substances.

        1.   April 24, 2020 Purchase of Fentanyl from ELGIN

     11.  On April 24, 2020, California Mobile Enforcement Team ("CALMET") assisted DEA Orange County District Office Task Force Group 1 and HSI conducted a buy/walk operation in the Anaheim, California. The CS had previously arranged to purchase an ounce of fentanyl from ELGIN for $1,800, in the parking lot of a McDonald's restaurant in Anaheim, CA.

     12.  At approximately 11:27 a.m., the CS parked in the McDonald's parking lot and was monitored via live audio transmission to investigators, in addition to in-person surveillance of the operation by other investigators. The audio transmission showed that ELGIN was ready to conduct the transaction and at approximately 11:37 a.m. TFO Leslie Franco observed ELGIN, at the McDonald's parking lot, exit a car driven by an unidentified male (parked next the CS's car), and then enter the front passenger seat of the CS's car.

     13.  Inside the vehicle, the CS and ELGIN had a brief conversation. ELGIN told the CS to be careful and that "it" (the suspected fentanyl) was exactly how ELGIN got it. ELGIN stated that it was "really gnarly" (*i.e.*, very strong) and told the CS to delete his/her messages because ELGIN did not want to get a "murder charge" (*i.e.*, if the CS dies of an overdose after taking the drugs). ELGIN then left the CS's car, got into the front

passenger seat of the car driven by the unidentified male, and left the parking lot.

14. At approximately 11:50 a.m., investigators met with the CS and retrieved the suspected fentanyl from him/her. The suspected fentanyl (Exhibit 67) was contained in a clear plastic Ziploc bag and appeared to be off-white in color. The substance was partially in a powder form and in chunks, which from my training and experience is consistent with the packaging and consistency of powder fentanyl. Investigators spoke with the CS about the transaction and he/she said that he/she received the fentanyl from ELGIN in exchange for the $1,800 in cash. The CS also told Investigators that he/she did not recognize the car used by ELGIN or the male driver. Subsequent testing by the DEA's Southwest Laboratory confirmed that the drugs were approximately 23.7 grams of a substance containing fentanyl.

2. <u>April 14, 2021 Purchase of Fentanyl from ELGIN</u>

15. On April 14, 2021 at approximately 11:30 a.m., Special Agents ("SAs") from HSI made contact with the CS to discuss the purchase of approximately 4 ounces of fentanyl from ELGIN. The CS had arranged to meet ELGIN at the SUBJECT PREMISES after she confirmed she was in possession of the fentanyl.

16. On April 15, 2021 at approximately 12:30 p.m., SAs from DEA and HSI met with the CS prior to their meeting with ELGIN. At the direction of the SAs, the CS sent a text message to ELGIN at 714-812-0454, stating that the CS was in the area of the SUBJECT PREMISES and ready to meet ELGIN to purchase the 4oz of fentanyl. At approximately 1:30 p.m., investigators saw

ELGIN outside of her home at 5225 Via Murcia, Yorba Linda, CA, 92886 (the SUBJECT PREMISES). Shortly thereafter investigators observed and listened (via telephonic recording device on the CS) as ELGIN and the CS met and completed the drug transaction. During the subsequent debriefing the CS gave investigators the purchased drugs. Subsequent testing by the DEA's Southwest Laboratory confirmed that the drugs were 9.6 grams of a substance containing fentanyl.

        3.   <u>June 10, 2021 Purchase of Fentanyl from ELGIN</u>

   17.  On June 10, 2021, at approximately 2:00 p.m., SAs from HSI again made contact with the CS to arrange to purchase approximately 2 ounces of powder fentanyl from ELGIN. The CS contacted ELGIN via text at 714-812-0454 to coordinate the transaction; ELGIN said that she was going to purchase the fentanyl for sale to the CS, and that ELGIN would then deliver the fentanyl to the CS on a later date.

   18.  On June 14, 2021 at approximately 4:00 p.m., SAs from DEA and HSI met with the CS prior to the meeting with ELGIN to purchase the fentanyl. SA Lup equipped the CS with a transmitting/recording device. At the direction of the SAs, the CS sent a text message to ELGIN at 714-812-0454, stating that the CS was in the area of the SUBJECT PREMISES and ready to meet ELGIN to purchase the 2 ounces of powder fentanyl. ELGIN replied that the CS should stop by the SUBJECT PREMISES.

   19.  At approximately 4:45 p.m., investigators observed ELGIN exit the SUBJECT PREMISES and enter the CS's car on the passenger side. The SUBJECT VEHICLE was parked at the residence.

Through the live audio transmission, investigators heard ELGIN and the CS conduct the fentanyl transaction in exchange for $2,900. ELGIN also gave the CS approximately 1.42 grams of methamphetamine because the fentanyl was less than the agreed-upon 2 ounces. DEA Lab results confirm the drugs contain fentanyl and methamphetamine, respectively.

      **C.**    **August 2018 Overdose Death of Victim C.L.**

      20.    On August 19, 2018, C.L. was found deceased in Long Beach, California. Toxicology analysis by the Los Angeles county coroner's office concluded that C.L. died of an accidental overdose caused by the effects of fentanyl toxicology.

      21.    C.L.'s family assisted the DEA in investigating the overdose death, including by giving access to C.L.'s cellular telephone. C.L.'s mother informed agents that she reviewed text messages on C.L.'s cellular telephone shortly before C.L.'s overdose death, during which she (C.L.'s mother) observed text messages from "Jackie Blue" arranging the sale of drugs to C.L. Agents were not able to locate the text messages on C.L.'s phone, likely because C.L. deleted them after a confrontation with her mother. Investigators later confirmed that the phone number for "Jackie Blue" belonged to one of ELGIN's associates, Jackie Ferrari.

      22.    Investigators also found text messages on C.L.'s phone between C.L. and ELGIN, in which investigators believe C.L. and ELGIN arranged to meet at the Extended Stay America Motel located at 1031 N. Pacificenter Drive in Anaheim, California on or about August 15, 2018, for a suspected narcotics transaction. For

8

example, in the messages, ELGIN provided the location for the motel and told C.L. to "come if you want blue," and "Dude if you want the blue shirt you begged me to borrow cone [n]ow." "Blue" or "blues" is a coded term commonly referring to oxycodone pills; it can also refer to fentanyl pills that are counterfeited to appear like oxycodone, sometimes unbeknownst to the user or dealer. I know that drug traffickers will often refer to opioid pills by blue items of clothing (e.g., "blue shirts" or "blue shorts") as a form of code. I thus believe that ELGIN was arranging to deliver oxycodone pills (or pills that appeared to be oxycodone but in fact contained fentanyl) to C.L. at the Anaheim hotel.

23. On September 11, 2018, DEA investigators went to the motel and contacted its general manager, Jaye Utu.

    a. TFO Charles Oeland showed Utu a picture of ELGIN. Utu immediately identified the photograph and said he had to escort ELGIN and her then-boyfriend (Chris Tatum) off the property on August 18, 2018. Utu also identified a photograph of Tatum as her boyfriend. Utu said that ELGIN and Tatum checked into the motel on August 15, 2018, with a check out date of August 17, 2018. However, they did not check out on August 17, 2018 and were escorted off the property on August 18, 2018. Utu provided us with an Extended Stay America guest check-in registration form in ELGIN's name.

    b. TFO Oeland showed Utu pictures of C.L. and of Ferrari; Utu recognized them both. He identified Ferrari as "Jackie" and stated that he has seen her with C.L., ELGIN, and

9

Tatum at the motel on several occasions.  (However, he did not remember either Ferrari or C.L. at the hotel when ELGIN rented a room on August 15, 2018.)  Approximately two to three months ago, Utu escorted "Jackie" (Ferrari) and another unknown female off the property for creating a disturbance.  Utu did not have any records of Ferrari registering at the motel.

24. Through the investigation, investigators determined that Ferrari was selling opioids and other drugs via Craigslist.  During his/her cooperation, the CS also told investigators that he/she purchases oxycodone from a trafficker named "Jackie" (Ferrari).  The CS arranged via text message to purchase 50 pills of oxycodone from FERRARI on January 10, 2019 for $1,200, and later carried out the transaction in Beverly Hills, California.

   a. On January 15, 2019, the Hon. Frederick F. Mumm, United States Magistrate Judge, issued a sealed complaint and related arrest warrant charging Ferrari with the earlier controlled sale (19-MJ-120), and search warrants for Ferrari's residence, vehicle, and cellular telephone (19-MJ-99, 19-MJ-100, and 19-MJ-102, respectively).

   b. The CS set up a further transaction for 180 pills with Ferrari, for January 18, 2019.  Ferrari met with the CS on that date to complete the transaction for 180 pills of oxycodone, during which Ferrari said that she was waiting for her supplier to arrive in a gray Toyota Prius to bring the pills.  Agents then arrested Ferrari on the federal complaint.

25. During the search of Ferrari's cellphone, agents found a text exchange between Ferrari and ELGIN discussing C.L.'s

10

overdose death, during which ELGIN confirmed that she sold "blues" to C.L. shortly before her death. As noted, "blues" is a coded term that commonly refers to oxycodone pills or to fentanyl pills that are counterfeited to appear like oxycodone. ELGIN sent the messages from 714-812-0454, *i.e.*, the same phone number that she used to set up the fentanyl sales to the CS in April 2020, April 2021, and June 2021. Moreover, the contacts in Ferrari's phone identified the number as belonging to ELGIN.

        a.    Specifically, on November 22, 2018, Ferrari told ELGIN, "This is Jackie. New number. I wanted to tell you c[] died. I just found out but it happened months ago. // I guess that's why I haven't heard from her." ELGIN expressed surprise on learning the news and asked how C.L. died. Ferrari responded, "She overdosed from SMOKING" (*i.e.*, smoking opioids). Ferrari also said that C.L. died in August and asked, "Had u sold to her in August at all?" ELGIN responded, "No // I didn't // Wait ya I did // 5 days before she died // Blues." ELGIN added, "That's terrible man i knew you could die from smoking it remember that kid."[2]

### D. Additional Probable Cause Regarding the SUBJECT PREMISES and the SUBJECT VEHICLE

26.    California Department of Motor Vehicle records confirm that the SUBJECT PREMISES is ELGIN's residence, and that the SUBJECT VEHICLE is registered to ELGIN at the SUBJECT PREMISES. Moreover, as discussed above, the April 2021 and June 2021

---

[2] ELGIN also stated in the exchange that she "stopped selling already" (*i.e.*, that she had stopped selling drugs). However, as the later undercover purchases demonstrate, any cessation in drug trafficking was temporary.

fentanyl transactions took place at the SUBJECT PREMISES, and the SUBJECT VEHICLE was parked at the SUBJECT PREMISES during the June 2021 fentanyl transaction. Based on my training and experience, targets will often keep paraphernalia as well as other indicia of criminal activity within their personally owned vehicles.

### V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ELGIN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ELGIN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

30. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

31. For all the reasons described above, there is probable cause to believe that Kimberly ELGIN violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (distribution of fentanyl), on or about April 14, 2021.

32. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT PREMISES, as described in Attachment A-1, and in the SUBJECT VEHICLE, as described in Attachment A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20th day of
July, 2021.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE